FILED
08/23/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2019 Session

**STATE OF TENNESSEE v. MOHAMED A. ALMAHMMODY**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-A-457      Angelita Blackshear Dalton, Judge**

_____

**No. M2018-01274-CCA-R3-CD**
_____

A jury convicted Mohamed A. Almahmmody, Defendant, of one count of first degree premeditated murder and three counts of aggravated assault. The trial court sentenced Defendant to a total effective sentence of life plus six years. On appeal, Defendant argues that the trial court erred in denying his motion to suppress evidence obtained from his cell phone as a result of an invalid search warrant and that the trial court erred in declining to provide a special jury instruction on self-defense in the killing of an innocent bystander. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Mohamed A. Almahmmody.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**Factual and Procedural Background**

On March 8, 2016, the Davidson County Grand Jury indicted Defendant and Tristen Jade Bowen for one count of first degree premeditated murder and three counts of aggravated assault. The trial court severed the trials of Ms. Bowen and Defendant.

*Motion to Suppress*

Prior to trial, Defendant filed a motion to suppress "any evidence that was obtained by the State through the search of . . . Defendant's cell phone; to wit: Samsung Galaxy Note MNPD property barcode #PR25276438." The motion asserted that the affidavit submitted in support of the search warrant did not sufficiently establish the affiant's basis of knowledge that Defendant was using the phone at issue during the commission of the offenses. The affidavit, sworn on August 18, 2015, stated that the MNPD sought to search for "[i]mages, [s]ims card, [m]icro memory data cards, text messages, call history, contacts, voice mails, emails, apps, any social media accounts, and all electronic information or data relating to cell phone and any evidence or items which would be used to conceal the forgoing or prevent [its] discovery." The affidavit listed the following statement of facts in support of probable cause:

> On 8/11/15, a homicide occurred at 2118 Vine Hill Rd. This cell phone was recovered from the suspect [Defendant] when he was arrested. It is believed that the suspect used this phone at the time of the homicide. There are communications from the suspect that contain information in regards to the homicide in question. The forensic download of the cell phone is needed to further the investigation.

Regarding Detective Chandler's basis of knowledge, the affidavit stated that Detective Chandler was assigned to the Midtown Hills Precinct Investigation Section as a Criminal Investigator. The affidavit stated that Detective Chandler had "participated in investigations involving violations of [h]omicides, [r]obbery, [a]ggravated assault, [t]hefts, weapon and narcotic related cases[,]" had "conducted surveillance, arrested suspects, executed search warrants, seized evidence, and assisted in the preparation of cases for trial where [Detective Chandler] ha[d] testified as a witness." Additionally, Detective Chandler had previously "questioned suspects, . . . consulted with other officers and prosecuting attorneys, and, as a result, ha[d] gained considerable experience."

At a hearing on Defendant's motion to suppress, no witnesses testified, and after entertaining arguments from the parties, the trial court took the motion under advisement. After a recess, the trial court denied Defendant's motion to suppress. The trial court found that, while "there probably could have been at least one more sentence [in the affidavit] to make certain facts more clear," based upon the content of the probable cause statement, the search warrant met the requirements of *State v. Tuttle*, 515 S.W.3d 282 (Tenn. 2017).

*Request for Jury Instruction*

During trial, Defendant filed a written request for the following special jury instruction: "A defendant who unintentionally injures a third party bystander while using justifiable force in self[-]defense may not be held criminally liable for his injury to the bystander."

The trial court denied the request and, instead, gave the following instruction to the jury:

> Included in the defendant's plea of not guilty is his plea of self-defense.

> If a defendant was not engaged in unlawful activity and was in a place where he had a right to be, he would have no duty to retreat before threatening or using force against the alleged victim when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force.

> In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the alleged victim include but are not limited to any previous threats of the alleged victim made known to the defendant; the character of the alleged victim for violence, when known to the defendant; the animosity of the alleged victim for the defendant, as revealed to the defendant by previous acts and words of the alleged victim; and the manner in which the parties were armed and their relative strengths and sizes.

> The use of force against the alleged victim would not have been justified if the defendant provoked the alleged victim's use or attempted use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the alleged victim the intent to do so, and the alleged victim nevertheless used or attempted to use unlawful force against the defendant.

> If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

## Jury trial

### The State's proof

Natasha Fite testified that, on August 11, 2015, she lived in the Vine Hill Road community with her son, Kenny Hatcher, who was eighteen at the time. She explained that the community had one entrance and one exit. Ms. Fite stated that the Vine Hill Community Center was a three- to five-minute walk from her residence. Mr. Hatcher frequently played basketball at the Vine Hill Community Center on Thursdays. On cross-examination, Ms. Fite testified that Mr. Hatcher did not have a reputation in the Vine Hill community for being involved with crime or for carrying a weapon. She recalled speaking with a detective approximately ten or eleven days before August 11, 2015, about a robbery that occurred in the Vine Hill community, but she did not remember informing the detective that Mr. Hatcher carried a weapon. She denied that Mr. Hatcher was suspected of being involved in the robbery. Ms. Fite agreed that Mr. Hatcher went to high school with Montez Love and that Mr. Hatcher was also friends with Kevin Smith and Antywuan Goodner. On redirect examination, Ms. Fite agreed that, after her son was shot and killed, she spoke with Detective Anthony Chandler. She agreed that she told Detective Chandler that, on the day before the shooting, Mr. Hatcher told her that his life was in danger because someone believed that he had committed a robbery. Mr. Hatcher informed Ms. Fite that he did not commit the robbery at issue and that he wanted to stay with his grandmother in La Vergne. During recross-examination, Ms. Fite explained that she had heard that Mr. Hatcher carried a weapon; when she asked him if he had a weapon on the day prior to the shooting, Mr. Hatcher informed her that he had previously carried a weapon, but he did not have it anymore.

Antywuan Goodner testified that he was a close friend with Mr. Hatcher. On August 11, 2015, he played basketball at the Vine Hill Community Center with Mr. Hatcher, Mr. Love, Mr. Smith, Mr. Goodner's cousin, and some other friends from the Vine Hill community. When the community center closed that evening, Mr. Goodner, Mr. Smith, Mr. Hatcher, and Mr. Love went to Mr. Hatcher's house and sat on the front porch. Around 9:30 p.m., a black Infiniti pulled up to Mr. Hatcher's house; Mr. Goodner was not familiar with the vehicle. When the vehicle approached the house, Mr. Goodner could only see the driver; however, he observed there was a passenger in the vehicle after the front passenger window was lowered. The black Infiniti stopped in front of Mr. Hatcher's house, and the female driver said, "What's up?" Mr. Goodner returned the greeting and observed that the male passenger pointed a gun through the open front passenger window and said something unintelligible. Mr. Goodner "took off running" towards the entrance of the community, and the male passenger began shooting. Mr. Goodner was scared and believed that the shooter would kill him. He heard the shooter fire over six times.

After Mr. Goodner ran from the shooting, he heard Mr. Hatcher's female neighbor scream. He returned to Mr. Hatcher's house and observed Mr. Hatcher lying on the back porch of the house. He did not see the black Infiniti leave the scene. After Mr. Goodner returned to Mr. Hatcher's house, police questioned him about the shooting. On August 13, 2015, two detectives spoke with Mr. Goodner while he was at school to see if he could identify the shooter. Mr. Goodner identified Defendant as the shooter both in the photographic lineup and at trial. Mr. Goodner asserted that none of the four friends sitting on Mr. Hatcher's porch on the evening of August 11 had a gun. He also stated that none of them threatened the driver of the Infiniti or Defendant. Mr. Goodner agreed that someone committed a robbery in the Vine Hill community prior to Mr. Hatcher's death and that Mr. Hatcher feared that he was in danger. He also agreed that the four friends were discussing Mr. Hatcher's fear immediately prior to the shooting.

During cross-examination, Mr. Goodner stated that he did not discuss the robbery with Mr. Hatcher. Mr. Goodner knew an individual named "Kevonte" but did not discuss the robbery with him. He explained that approximately ten minutes elapsed between the shooting and his return to Mr. Hatcher's house. When he returned to the house, he observed Mr. Love, Mr. Smith, and other neighbors gathered around Mr. Hatcher's body. He also heard sirens from approaching emergency responders. Mr. Goodner testified that he had not seen Defendant prior to the shooting.

Montez Love testified that in August 2015, he was seventeen years old, lived in the Vine Hill community, and was friends with Mr. Hatcher. On August 11, 2015, Mr. Love began playing basketball with Mr. Hatcher, Mr. Goodner, and other members of the neighborhood around seven p.m. at the Vine Hill Community Center. After Mr. Love and his friends finished playing basketball, Mr. Love walked to his house with Mr. Goodner. He saw Mr. Hatcher sitting on the front porch of Mr. Hatcher's house with Mr. Smith. Mr. Love and Mr. Goodner walked over to Mr. Hatcher's house and sat with Mr. Hatcher and Mr. Smith on the front porch. The friends discussed college and their future plans. Approximately fifteen minutes later, a black Infiniti stopped in front of Mr. Hatcher's house. Mr. Hatcher said, "[W]ho is that?" Mr. Love heard a female voice say, "[W]hat's up[,] you guys[?]" He then saw a man in the front passenger seat point a gun out the vehicle's window. Mr. Love ran and heard shots. He looked back and observed Mr. Hatcher "hop over the guard rails at the house and he had crawled to the back porch." Mr. Love continued running and heard a total of eight or nine shots.

Mr. Love later returned to Mr. Hatcher's house and spoke with police about the shooting. He observed that, after the shooting, the black Infiniti circled the Vine Hill community, stopped for a few seconds, and then exited the community. Mr. Love recognized the driver of the black Infiniti as Tristen Bowen. Mr. Love attended school with Ms. Bowen, and he recognized the black Infiniti as Ms. Bowen's vehicle. Mr. Love

did not recognize the passenger of Ms. Bowen's vehicle who shot Mr. Hatcher. He asserted that none of the four friends had a weapon on the evening of August 11, 2015. Mr. Love was not aware of a robbery that occurred in the Vine Hill community a week or two prior to Mr. Hatcher's death. He also stated that he did not think anyone was concerned for Mr. Hatcher's safety prior to the shooting. On cross-examination, Mr. Love agreed that, during his interview with police on August 12, 2015, he discussed the robbery of Ms. Bowen and Muslah al-Nimar that occurred approximately ten days prior to Mr. Hatcher's death.

Kevin Smith testified that, at the time of Mr. Hatcher's death, he had known Mr. Hatcher for four or five years. On the evening of August 11, 2015, Mr. Smith played basketball at the Vine Hill Community Center with Mr. Hatcher, Mr. Love, Mr. Goodner, and other members of the Vine Hill community. After the four friends finished playing basketball, they went to Mr. Hatcher's house and sat on the front porch or stood in the front yard. While the four friends were at Mr. Hatcher's house, Mr. Smith observed a vehicle, a black Infiniti, approaching Mr. Hatcher's house from the entrance of the community. Mr. Smith initially only saw the driver of the black Infiniti, a female, who stopped in front of Mr. Hatcher's house and said, "[W]hat's up, what's up[?]" Mr. Smith said, "[W]ho are you?" Mr. Smith then saw a man in the front passenger seat, which was closest to Mr. Hatcher's house, lower the window and point a gun at the four friends. The passenger began shooting towards Mr. Hatcher's house, and Mr. Smith ran from the scene. Mr. Smith heard the passenger shoot between five and nine times. He heard tires screech, but he did not see the vehicle leave the community. When Mr. Smith returned to Mr. Hatcher's house, he initially went to the front of the house and saw that the front door was open. Mr. Smith walked around to the back of the house and observed Mr. Hatcher lying on the back porch. On August 12, 2015, Mr. Smith viewed a photographic lineup and identified Defendant as the passenger of the black Infiniti who shot Mr. Hatcher. Mr. Smith asserted that none of the four friends had a gun with them on the evening of August 11, 2015. He also stated that none of the four men verbally or physically threatened Defendant or the female driver of the black Infiniti.

Mr. Smith was aware that someone committed a robbery in the Vine Hill community a few weeks prior to Mr. Hatcher's death. He testified that he and Mr. Hatcher observed the robbery while they were sitting on Mr. Hatcher's front porch. Mr. Smith stated that people ran away from the scene of the robbery and ran past Mr. Hatcher's house towards a park. After the robbery, a female approached Mr. Smith and Mr. Hatcher and yelled at Mr. Hatcher, who was shocked. Mr. Smith testified that the female who approached Mr. Hatcher after the robbery was the same woman who drove the black Infiniti while Defendant shot Mr. Hatcher. After Mr. Smith and Mr. Hatcher observed the robbery, Mr. Hatcher informed Mr. Smith that he received threatening calls and messages.

- 6 -

William Taylor stated that in August 2015, he worked for the Metro Nashville Police Department ("MNPD") at the Midtown Hills Precinct as a patrol officer. On August 11, 2015, Officer Taylor responded to Mr. Hatcher's residence on Vine Hill Road, after dispatch informed Officer Taylor that shots had been fired at the location. When Officer Taylor arrived at the scene of the shooting, "there was a small to medium size crowd of people outside the residence." After exiting his patrol car, Officer Taylor observed bullet casings on the street outside of Mr. Hatcher's residence. Officer Taylor walked behind the residence and saw Mr. Hatcher lying "face down half-way in, half-way outside of the residence." Mr. Hatcher was not moving, and his breathing was shallow. Officer Taylor began to provide medical aid to Mr. Hatcher and observed a gunshot exit wound on the right side of Mr. Hatcher's chest and an entry wound on Mr. Hatcher's left side under his arm. After an ambulance arrived and transported Mr. Hatcher to a hospital, Officer Taylor secured the scene and collected evidence, including shell casings and "a bullet hole in a nearby air conditioner unit." Officer Taylor did not observe any weapons at the crime scene.

Officer Chris Davis testified that in August 2015, he worked at the Midtown Hills Precinct of the MNPD. On August 11, 2015, Officer Davis responded to Mr. Hatcher's residence regarding "a juvenile that had been shot and a 'shots fired' call." When Officer Davis arrived at the scene, he ran to the back of the residence and observed Officer Taylor giving Mr. Hatcher medical aid. Officer Davis observed that the back door of the residence was open, and he conducted a protective sweep of the residence with other officers. Officer Davis did not observe any individuals or weapons inside Mr. Hatcher's residence. He also did not observe any weapons on Mr. Hatcher while Officer Taylor gave Mr. Hatcher aid. After clearing the residence, Officer Davis assisted in controlling the crowd and obtained information about the shooting. Some witnesses observed that "a dark colored sedan, possibly an Infiniti[,] . . . had pulled up in front of the house[,] fired several shots, [and] took off." After hearing the description of the shooter's vehicle, Officer Davis informed dispatch that, as he was driving towards the scene, he observed "a black Infiniti that was driving at a somewhat high rate of speed" that was headed towards Nolensville Pike.

Sergeant Robert Smith testified that he worked in the Crime Scene Unit of the MNPD. On August 11, 2015, Sergeant Smith responded to the scene of Mr. Hatcher's shooting around 11:10 p.m. He observed nine .45 caliber cartridge casings in the street in front of Mr. Hatcher's residence. He also observed "strike marks" on the front door of the residence, on the trash can behind the residence, and at the house behind Mr. Hatcher's residence. Sergeant Smith explained that strike marks are defects that occur when a bullet strikes an object. Sergeant Smith did not observe any weapons at the scene of the shooting.

Kelly Soulliere testified that she worked as a paramedic with the Nashville Fire Department. On August 11, 2015, Ms. Soulliere responded to a possible shooting at Mr. Hatcher's residence around 9:30 p.m. After she and her co-worker arrived at the scene, they observed that fire department personnel were performing CPR on Mr. Hatcher. Ms. Soulliere and her co-worker placed Mr. Hatcher on a stretcher and transported him to an ambulance while continuing to perform CPR. At this point, Mr. Hatcher had no pulse and was not breathing. Ms. Soulliere observed that Mr. Hatcher sustained a gunshot wound to his right chest and to his left torso. She also observed a laceration on his lower left leg. Ms. Soulliere and her co-worker transported Mr. Hatcher to Vanderbilt University Medical Center.

Investigator Warren Fleak testified that he worked as a crime scene investigator for the MNPD. On August 11, 2015, Investigator Fleak responded to the crime scene at Mr. Hatcher's residence. When he arrived, he observed that another investigator had previously arrived and was photographing the scene and collecting evidence. Investigator Fleak created a diagram of the crime scene and the items of evidence that had been collected. On August 14, 2015, Investigator Fleak responded to the scene of a motor vehicle accident at the intersection of Perimeter Hill Road and Antioch Pike. The vehicle involved in the wreck, an SUV, had failed to stop at a stop sign and had collided with a garbage truck. Investigator Fleak photographed the scene of the accident. He found a cell phone on the driver's side floor board of the SUV and a loaded Sig Sauer handgun under the driver's seat.

Investigator Lynette Mace testified that she worked in the Forensic Services Division, Crime Scene Investigation Section of the MNPD. On August 11, 2015, Investigator Mace responded to the scene of the shooting at Mr. Hatcher's residence. The scene had already been secured when Investigator Mace arrived, and she collected "[s]everal cartridge cases located in the street in front of the [victim's] residence . . . as well as bullet defects in the front of the house and some to the house to the rear[.]" Investigator Mace also photographed the scene.

Derrick Trotter testified that in August 2015, he lived in the Vine Hill community. On August 11, 2015, while he sat outside his residence in his vehicle, he heard gunshots and observed a black Infiniti turn onto the street. As the black Infiniti drove past Mr. Trotter, he observed two people inside the vehicle—a female and a male. The black Infiniti stopped at a stop sign, turned around, and drove quickly past Mr. Trotter again. Shortly thereafter, Mr. Trotter heard gunshots and saw people running towards his house. The running people did not have weapons in their hands.

Donnell Hathaway testified that he lived in the Vine Hill community in August 2015, in another apartment complex behind Mr. Hatcher's house. On August 11, 2015,

Mr. Hathaway heard several gunshots. Mr. Hathaway exited his residence and observed a black Infiniti drive down the street, stop at a stop sign, and turn on a side street. He observed two people in the vehicle—a person with a ponytail and a person wearing a hat backwards. Mr. Hathaway then walked towards Mr. Hatcher's residence and observed Mr. Hatcher lying on the back porch. He did not observe any weapons around Mr. Hatcher's residence.

Jaylan Keeling testified that on August 11, 2015, he lived in the Vine Hill community, and he had known Mr. Hatcher for approximately fourteen years. That evening, Mr. Keeling saw Mr. Hatcher at the Vine Hill Community Center while Mr. Hatcher was playing basketball with his friends. After leaving the center, Mr. Keeling stopped by Mr. Hatcher's residence before returning to his residence. Later, Mr. Keeling left his residence and went to a residence on the same street as Mr. Hatcher's residence. Approximately thirty minutes later, Mr. Keeling heard gunshots. He heard screaming and ran over to Mr. Hatcher's residence. Mr. Keeling observed Mr. Hatcher lying on the back porch. He did not observe any weapons at Mr. Hatcher's residence.

Detective Jonathan McGowen testified that he worked for the MNPD at the Midtown Hills Precinct. Detective McGowen responded to the scene of Mr. Hatcher's shooting and "look[ed] for witnesses who might have seen what happened." He spoke with Mr. Smith and Mr. Love, who agreed to give statements at the Midtown Hills Precinct. Detective McGowen returned to the Midtown Hills Precinct and searched for Ms. Bowen's social media accounts. He observed a photograph of a black Infiniti on her Facebook profile. Detective McGowen then searched for information relating to the black Infiniti in the Tennessee Vehicle Records and learned that Ms. Bowen's father had registered ownership of a 2013 black Infiniti. He also obtained Ms. Bowen's driver's license number and address, which he gave to Detective Chandler.

Later, Detective McGowen and Detective Erin Riley went to Ms. Bowen's listed address and observed a black Infiniti parked in the driveway. Detective Chandler was also at the residence, speaking to Ms. Bowen's father. Detective McGowen later transported Ms. Bowen to the South Precinct for an interview. At the South Precinct, Detective McGowen created a photographic lineup at Detective Chandler's request. Detective Chandler later showed the lineup to the witnesses of the shooting. On August 13, 2015, Detective McGowen assisted in the execution of a search warrant on Defendant's residence; he did not find any evidence relevant to the current case. On August 14, 2015, Detective McGowen traveled to a hotel in Nashville to determine whether Defendant had been staying there.

Investigator Charles Linville testified that he worked for the MNPD in the Evidence Processing Unit of the Crime Scene Investigation Section. After Ms. Bowen's

black Infiniti was towed to the MNPD Crime Laboratory, Investigator Linville processed the vehicle for evidence. He searched and photographed the vehicle, collected items, and processed items of evidentiary value, including an empty ammunition box and a used shooting target.

Detective Robert Simmons testified that he worked for the MNPD at the Midtown Hills Precinct. He attended the autopsy of Mr. Hatcher, where he collected a .45 caliber bullet, fingernail clippings, and a hair sample from Mr. Hatcher. Additionally, Detective Simmons interviewed Mr. Smith and showed him a photographic lineup. Detective Simmons also applied for a "ping" order for Defendant's cell phone, which is "a court document similar to a search warrant that is signed by a [j]udge or a magistrate that allows the police to get certain information on a cell phone such as GPS locations or [c]all history or call data." On August 13, 2015, Detective Simmons spoke with Mr. Goodner at Hillsboro High School. Detective Simmons showed Mr. Goodner a photographic lineup, and Mr. Goodner identified Defendant as the individual who shot and killed Mr. Hatcher. Detective Simmons also applied for a warrant to search Defendant's residence; when the MNPD executed the search warrant, officers found a box of .45 caliber bullets in a bedroom. At this point in the investigation, the MNPD was in possession of Ms. Bowen's cell phone. Detective Simmons sent Defendant a text message from Ms. Bowen's cell phone in order to obtain Defendant's location for purposes of executing an arrest warrant. Additionally, Detective Simmons assisted in obtaining search warrants for social media accounts of Ms. Bowen, Defendant, and Mr. Hatcher.

Detective John Patton testified that he worked for the MNPD in the South Precinct. On August 14, 2015, Detective Patton was patrolling when he responded to the scene of a vehicle accident in Antioch. When Detective Patton arrived, other officers had already placed Defendant, who was the driver of the wrecked vehicle, in handcuffs. Defendant's vehicle, an SUV, had front-end damage from the wreck. Detective Patton took an inventory of Defendant's vehicle. During his inventory search of the vehicle, Detective Patton found a cell phone and a firearm. He found the firearm underneath the driver's seat of the vehicle.

Christopher Jones testified that he had known Mr. Hatcher since they were in fifth grade. On August 11, 2015, Mr. Jones played basketball at the Vine Hill Community Center with Mr. Hatcher and other friends. Mr. Jones stated that Mr. Hatcher and Mr. Smith left the basketball game first. Later, Mr. Jones and a friend left the community center and walked past Mr. Hatcher's house on their way to Mr. Jones' friend's house. After walking his friend home, Mr. Jones returned to his residence. Mr. Jones later observed Mr. Love running away from Mr. Hatcher's residence, and he heard gunshots. He observed a black Infiniti drive quickly away from Mr. Hatcher's house. He then saw

Mr. Hatcher open the back door of Mr. Hatcher's residence and fall onto the back porch. Mr. Jones did not observe anyone moving or removing evidence from Mr. Hatcher's residence. He also did not observe Mr. Hatcher, Mr. Smith, Mr. Goodner, or Mr. Love with a weapon.

Detective Anthony Chandler testified that he worked for the MNPD at the Midtown Hills Precinct. Detective Chandler was the lead investigator in the shooting of Mr. Hatcher. When he arrived at the scene of the shooting, Detective Chandler observed shell casings in the street directly in front of Mr. Hatcher's residence. He did not observe any weapons inside or outside the residence. Later, Detective Chandler returned to the Midtown Hills Precinct to interview Mr. Love, Mr. Smith, and Mr. Goodner. Detective Chandler developed Ms. Bowen as a suspect in the shooting when Mr. Love informed Detective Chandler that he recognized Ms. Bowen as the driver of the black Infiniti used in the shooting. Detective Chandler accessed Ms. Bowen's social media pages and found photographs of a black Infiniti. Detective Chandler later went to Ms. Bowen's residence and observed a black Infiniti in the driveway; officers towed this vehicle to the MNPD Crime Laboratory where it was processed by Investigator Linville. Detective Chandler interviewed Ms. Bowen at her residence; she informed Detective Chandler of Defendant's phone number. Ms. Bowen gave a second statement at the South Precinct. Detective Chandler obtained Ms. Bowen's iPhone and obtained a search warrant for her iPhone and the black Infiniti. Detective Chandler transported Ms. Bowen's phone to the Surveillance and Investigative Support Unit ("SISU") of the MNPD. Detective Chandler testified that he did not request gunshot residue tests because such tests may give false positives. Detective Chandler stated gunshot residue tests on Mr. Hatcher, Mr. Love, Mr. Smith, or Mr. Goodner would have had no evidentiary value.

On August 12, 2015, Detective Chandler met with Mr. Love at his residence and showed Mr. Love a photographic lineup. Mr. Love indicated that he recognized Defendant as the shooter, but he did not feel confident in his identification. Detective Chandler also met with Mr. Smith at his residence and showed Mr. Smith a photographic lineup. Mr. Smith identified Defendant as the shooter. Detective Chandler met with Mr. Goodner at Hillsboro High School and showed Mr. Goodner a photographic lineup. Mr. Goodner also identified Defendant as the shooter.

Later, Detective Chandler received a report from the SISU unit regarding Ms. Bowen's phone. The report showed that Ms. Bowen had received a text message from a contact listed as "Mo" in her phone contact list. Detective Chandler noted that the phone number listed for "Mo" was the same number that Ms. Bowen informed Detective Chandler belonged to Defendant. Detective Chandler obtained arrest warrants for Ms. Bowen and Defendant. Detective Chandler also obtained a "ping order" for Defendant's cell phone number and a search warrant for Defendant's residence. Prior to the execution

of the search warrant for Defendant's residence, Detective Simmons sent controlled text messages to Defendant's phone number using Ms. Bowen's cell phone to encourage Defendant to be at the residence during the search. When Detective Chandler realized that Defendant would not return to the residence, he executed the search, and officers collected two thumb drives, Federal .45 caliber shell casings, and a USB with cell phone data. During the search of Defendant's residence, Detective Chandler received text messages from Defendant on Ms. Bowen's phone, and later, Defendant called the phone. Detective Chandler answered Ms. Bowen's phone and spoke with Defendant after identifying himself as a detective with the MNPD. Defendant agreed to meet Detective Chandler at the Midtown Hills Precinct in approximately an hour and a half. However, Defendant did not come to the Midtown Hills Precinct at the agreed-upon time.

On August 14, 2015, Detective Chandler traveled to the scene of a vehicle accident based on information gathered from the ping order. When Detective Chandler arrived at the scene, Defendant was in an ambulance. Detective Chandler observed a Samsung cell phone in the driver's side floorboard and a Sig Sauer .45 semi-automatic handgun under the driver's seat. On August 17, 2015, Detective Chandler obtained Mr. Hatcher's Nokia cell phone from Mr. Hatcher's grandfather. Detective Chandler took both Defendant's phone and Mr. Hatcher's phone to the SISU unit to be processed. He also asked the MNPD Crime Laboratory to test-fire the Sig Sauer handgun found in Defendant's vehicle. Additionally, Detective Chandler obtained search warrants for the social media accounts of Defendant, Mr. Hatcher, and Ms. Bowen.

On August 19, 2015, Detective Chandler obtained video surveillance from the Vine Hill community and from a cemetery. On August 25, 2015, Detective Chandler learned of video that was pulled from Defendant's cell phone, which created interest in the cemetery. MNPD crime scene investigator Officer George Bouton met Detective Chandler and other MNPD officers at the cemetery. Officer Bouton gave Detective Chandler evidence collected at the cemetery to take to the crime lab.

As part of the investigation into Mr. Hatcher's homicide, Detective Chandler began investigating the robbery in the Vine Hill community. Detective Chandler found no evidence that Mr. Hatcher, Mr. Love, Mr. Smith, or Mr. Goodner were involved in the commission of the robbery. Detective Chandler learned that Ms. Bowen's boyfriend, Muslah Al-Nimar, was a victim in the Vine Hills community robbery and was then killed approximately two weeks before Mr. Hatcher's death, but after the robbery occurred. Detective Chandler stated that the indicted suspects in Mr. Al-Nimar's case did not include Mr. Hatcher, Mr. Love, Mr. Smith, or Mr. Goodner.

On cross-examination, Detective Chandler agreed that he was not an expert on gunshot residue testing. He also agreed that Mr. Hatcher's mother, Ms. Fite, had relayed

information that Mr. Hatcher may have had a weapon, though she never saw one herself. Detective Chandler explained that no witness, including Ms. Bowen, stated that Mr. Hatcher or anyone on the porch fired a weapon. Moreover, there were no shell casings collected anywhere except the street. Detective Chandler testified that the search for the shell casings was at night, and the officers at the scene did not use metal detectors near or around the house to search for casings in the grass or bushes.

Officer George Bouton testified that he had been a crime scene investigator with MNPD since 1994 and worked as a firearm and toolmark examiner for several years. As a part of his job duties, Officer Bouton examined components of ammunition and performed microscopic comparisons. On August 25, 2015, Officer Bouton assisted with the execution of a search warrant at a cemetery on River Road Pike. Officer Bouton found five fired cartridge casings, photographed them in their locations, and collected them as evidence. From the end of each fired cartridge casing, Officer Bouton determined that the casings were .45 caliber auto, manufactured by Remington Peters.

On cross-examination, Officer Bouton explained that he found two casings by sight, and three casings by the use of a metal detector. Officer Bouton stated that to his knowledge, everyone in the CSI unit is issued a metal detector.

Ryan Kent testified that he worked for the MNPD Crime Lab at the Madison Precinct. Mr. Kent reviewed the report and the evidence. Mr. Kent also compared the cartridge cases and the recovered bullets and determined that the casings came from the firearm removed from Defendant's vehicle, but the tests on the bullets were inconclusive.

On cross-examination, Mr. Kent testified that he entered the cartridges that were test-fired from Defendant's gun into the National Integrated Ballistic Information Network database for a test comparison, and he found no associations to other cases.

Detective Erin Riley testified that she worked as a detective with the MNPD in the Midtown Hills Precinct. Detective Riley responded to Mr. Hatcher's residence on August 11, 2015. Later, Detective Riley and Detective McGowen spoke with Ms. Bowen at her residence, and the detectives had Ms. Bowen's black Infiniti towed for investigation. Officers interviewed Ms. Bowen at the precinct and then escorted her back to her home. At that point, Ms. Bowen voluntarily relinquished her cell phone to Detective Riley, who in turn gave it to Detective Chandler at the Midtown Hills precinct.

Detective Chad Gish testified that he was a detective with MNPD, specializing in digital forensics. Detective Gish analyzed the cell phones of Ms. Bowers, Defendant, and Mr. Hatcher. Many of the text messages on Defendant's phone and Ms. Bowen's phone were deleted, but Detective Gish was able to recover them. Detective Gish found a text

message thread on Defendant's cell phone, from the early morning of August 3, 2015, to an unlisted contact, stating that Defendant wanted to do a "black-out on dude family." The unlisted contact texted back, "I swear don't you do anything to jeopardize me having to see you through bars. I am not kidding baby. You are not thinking straight right now." Next, a text message thread on August 6, 2015, between Defendant and one of his contacts, "Kris," indicated that Defendant had fired several rounds near Mr. Al-Nimar's gravesite and that Defendant intended to keep his firearms with him "under his shirt."

Another text message thread began on August 11, 2015, after 11:00 p.m., between Defendant and Ms. Bowen:

> [MS. BOWEN]: You really have proven yourself to me tonight[.]
>
> [DEFENDANT]: It's nothing baby don't worry I got you I promise I do. . . LOL I'm happy too I'm more glad your [sic] happy.
>
> [MS. BOWEN]: You're my guardian angel. . . Damn babe you are a sniper for real.

Later that hour, another excerpt read:

> [MS. BOWEN]: I can't believe you got the right guy, babe.
>
> [DEFENDANT]: Not me, MuMu, trust me.
>
> [MS. BOWEN]: Everyone is calling me and telling me that [Mr. Hatcher is dead], and I'm like, what, for real, LOL.
>
> [DEFENDANT]: It sucks for his mom. Maybe his mom is gonna feel the pain her sh**ty son caused other people.
>
> [MS. BOWEN]: Hell yeah. F*** him and his family.
>
> [DEFENDANT]: You already know. They was [sic] laughing when they got MuMu. Play now, cry later.

After midnight on August 12, 2015, the text messages between Defendant and Ms. Bowen continued:

> [MS. BOWEN]: I just hope we will be okay. I hope none of his friends recognized me.

- 14 -

[DEFENDANT]: We are, please stop. If they did[,] police would have got us. Trust me. Just relax.

After 5:00 a.m. on August 12, 2015, the text messages between Defendant and Ms. Bowen continued:

[MS. BOWEN]: Oh sh\*t babe. I just found out that [Mr. Love] was on the porch too. He knows me and he knows my car, Mo. He's the one that robbed me.

[DEFENDANT]: So he's next.

[MS. BOWEN]: I'm scared now. . . He's gonna snitch. I know he is, babe.

Detective Gish also recovered a text message thread between Defendant and a contact named "Corry," dated August 15, 2015. Defendant told Corry, "[A]t least I got revenge for my little bro. I swear blood couldn't get me and him any closer. He was the mastermind of my little brother['s] robbery that ended up in a cold-blooded murder at Shell. Muslah, RIP." Detective Gish extracted internet search history from Defendant's cell phone. One internet search was on August 11, 2015, at 11:45 p.m., searching "South Nashville shooting."

Dr. Thomas Deering testified that he was the Deputy Chief Medical Examiner for Metro Nashville and that he performed Mr. Hatcher's autopsy. Dr. Deering found three gunshot wounds on Mr. Hatcher: one bullet grazed Mr. Hatcher under his chin, one bullet entered on the left side of Mr. Hatcher's chest, and one bullet entered through the bottom of Mr. Hatcher's left foot and traveled up to Mr. Hatcher's left knee. Dr. Deering said that the bullet through Mr. Hatcher's foot indicated Mr. Hatcher was trying to climb over the porch railing when he was shot. Moreover, Dr. Deering concluded the gunshot wound to Mr. Hatcher's chest was the cause of death, and the manner of death was homicide.

Dr. Deering explained that a gunshot residue test was "kind of a useless test" because of the many ways the test can produce a false positive. On cross-examination, Dr. Deering stated that he had performed many gunshot residue tests in his career until about 2010. Dr. Deering clarified that he had performed gunshot residue tests only at the request of law enforcement, not because he had believed the tests were necessary.

- 15 -

*Defendant's proof*

Defendant testified that, prior to August 11, 2015, he knew nothing about Mr. Hatcher, Mr. Love, Mr. Goodner, or Mr. Smith. Defendant additionally stated that he had never been to the Vine Hills community prior to August 11, 2015. Defendant said that he was saddened and concerned when Mr. Al-Nimar was killed because of rumors that Mr. Al-Nimar was "set up by a drug dealer and killed by a gang." Because Defendant sold marijuana with Mr. Al-Nimar in the past, he believed that his drug association and close friendship with Mr. Al-Nimar put him in jeopardy. Thus, Defendant chose to carry a weapon after Mr. Al-Nimar's death. Defendant testified that he and Ms. Bowen began dating shortly after Mr. Al-Nimar's death. Defendant claimed the only person he thought might be associated with Mr. Al-Nimar's death was "some dude named Oscar." Defendant said that he had not heard any rumors connecting Mr. Hatcher, Mr. Love, Mr. Goodner, or Mr. Smith to Mr. Al-Nimar's death. Moreover, Defendant said he knew very little about the robbery of Ms. Bowen and Mr. Al-Nimar.

Defendant testified that on August 11, 2015, Ms. Bowen picked him up, and the two of them drove to visit Mr. Al-Nimar's grave, followed by a visit to the Parthenon to feed ducks with a loaf of bread. In between duck feedings, Ms. Bowen began receiving threatening text messages. Defendant testified that he and Ms. Bowen next went to McDonald's for sweet tea. After this stop, Ms. Bowen and Defendant drove into a neighborhood he had never seen before, sometime between 8:00 p.m. and 9:00 p.m. Defendant explained that he was carrying his weapon with him. Defendant stated that, as Ms. Bowen was driving, he heard her yell, "[W]hat's up[?]" Ms. Bowen then said to Defendant, "[T]hat's them," and Defendant looked in the direction Ms. Bowen indicated towards a porch. The porch had no light on. Defendant testified that he saw "somebody peer[ing] down, and I was like who is that? What's up?" He stated that he then saw "somebody come up out of their pants with a weapon." Defendant testified that he reached to the floorboard to retrieve his gun and told Ms. Bowen "go, go, go, he has a gun." Defendant said he heard a "pop," so he ducked his head, pointed his weapon out of the car window, and began firing because he was "panicking." Defendant said that Mr. Goodner was the person who shot at him, and the first time he knew Mr. Goodner's name was at trial. Defendant testified that Ms. Bowen then drove them towards Defendant's parents' house. Defendant testified that he and Ms. Bowen discussed the shooting while driving away from the scene and that Ms. Bowen called Defendant her "angel" and thanked him for saving her life. Defendant responded, "[N]aw, if what you are saying is true, I guess it is all MuMu," referring to Mr. Al-Nimar. When they arrived at Defendant's parents' house, Defendant exited the vehicle smoking a cigarette because he was "shaking." Defendant testified that, at this point, Ms. Bowen explained that the people Defendant fired at were the ones who were responsible for Mr. Al-Nimar's death.

Defendant claimed that this was the first time he heard Mr. Hatcher's name in connection with Mr. Al-Nimar's death.

Regarding the text messages the State admitted into evidence, Defendant explained that the messages were expressions of both relief and fear after Mr. Goodner shot at them. Defendant claimed that other messages were expressions of surprise that Mr. Hatcher had been killed, as well as satisfaction at the comeuppance Mr. Hatcher received. Defendant testified that he did not turn himself in after learning that Mr. Hatcher had died because he was scared. Eventually, Defendant was arrested, at which time he claimed the officers beat "the hell . . . out of" him, sending him to the hospital. Defendant stated that the police questioned him immediately after his release from the hospital while he was heavily medicated.

On cross-examination, Defendant testified that he and Mr. Al-Nimar were "pretty close" and that they had been friends about a year before Mr. Al-Nimar's death. Defendant agreed that he was distraught over Mr. Al-Nimar's death and that he went to his gravesite and fired shots in the air on August 6, 2015. Defendant did not dispute that he said, "[T]his is for you[,]" while firing shots in the air in the cemetery. Defendant stated that Mr. Al-Nimar told him about the robbery before his death, that Mr. Al-Nimar "was set up for a weed deal, and that they beat up [Mr. Al-Nimar's] girl[.]" However, Defendant claimed that, after Mr. Al-Nimar's death, when he and Ms. Bowen began dating, Ms. Bowen never mentioned the robbery to him. Defendant explained that he bought one of his guns at a gun show and two other guns "off the street[.]" Defendant agreed that he bragged to his friends about how powerful his new guns were. Defendant stated that he practiced shooting accuracy "maybe on[c]e or twice, three times probably at the max." Defendant agreed that he intentionally raised his gun, pointed it in the direction of the four victims, and chose to pull the trigger. Defendant agreed that he did not tell the same story regarding the events of August 11, 2015, to MNPD detectives when he was initially questioned. He claimed that he initially denied involvement in the homicide because officers had just beaten him. Defendant also agreed that he had been in a car wreck immediately preceding his arrest where he sustained some injuries, but he claimed that most of the injuries came from the beating. Defendant admitted that, when he was arrested on August 14, 2015, he had prior notice that he was a suspect in this case. Defendant agreed that he chose to drive away when the officers came to arrest him.

Following deliberations, the jury found Defendant guilty of first degree premeditated murder in count one and aggravated assault in counts two, three, and four. The trial court imposed an automatic life sentence for count one and scheduled a sentencing hearing for counts two, three, and four.

## *Sentencing hearing and motion for new trial*

At a subsequent sentencing hearing, the trial court sentenced Defendant to six years each for counts two, three, and four, concurrent to each other but consecutive to Defendant's life sentence for count one, for a total effective sentence of life plus six years.

Defendant filed a timely motion for new trial, which the trial court denied. In its written order, the trial court concluded that "the probable cause statement in the affidavit in support of the search warrant contain[ed] more than conclusions and provide[d] sufficient information for a probable cause determination." Further, the trial court concluded that "Defendant's possession of the cell phone at the time of his arrest along with communications from . . . Defendant regarding the homicide reasonably create[d] a nexus between . . . Defendant's cell phone and the homicide." The trial court found that the "statements contained in the search warrant affidavit address[ed] the 'commonsense, practical question whether there [wa]s "probable cause" to believe that contraband or evidence is located in a particular place.'" Additionally, the trial court concluded that the special instruction on self-defense that Defendant requested went "beyond explaining the law." Thus, the trial court concluded that the provided jury instructions "adequately explained the law as to each issue of fact raised by the proof."

Defendant now timely appeals the trial court's judgments.

## Analysis

## *Denial of Defendant's motion to suppress*

Defendant argues that the trial court erred in denying his motion to suppress the search of his cell phone because the search warrant lacked sufficient probable cause. Defendant asserts that the affidavit that supported the search warrant only contained "conclusions by the affiant, Detective Anthony Chandler" that the phone may have contained evidence, did not establish why Detective Chandler believed that Defendant used the phone at the time of the offenses, and did not show the basis of Detective Chandler's knowledge that the phone contained communications from Defendant related to the offenses.

The State responds that the trial court properly denied the motion to suppress because "the affidavit was based in part on information provided by other law enforcement officers whose information is presumed to be reliable[.]" Moreover, the State contends that Defendant bases his assertion on the "now-overruled two-part test for evaluating information provided by an informant who is either unknown or from the

- 18 -

'criminal milieu'" rather than the "totality of the circumstances" test adopted by our supreme court in *State v. Tuttle*, 515 S.W.3d 282 (Tenn. 2017). The State argues that under the "totality of the circumstances" test, there was no requirement for the affidavit to contain facts showing how MNPD "learned that [Defendant's] cell phone would contain evidence that would aid the investigation."

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Daniel*, 12 S.W. 2d 18, 23 (Tenn. 1996)).

In *State v. Tuttle*, our supreme court set out the requirements for probable cause in an affidavit for a search warrant, adopting a "totality of the circumstances" test. 515 S.W.3d at 307. Both the United States Constitution and the Tennessee Constitution instruct that a search warrant may not be issued "unless a neutral and detached magistrate determines that probable cause exists for [its] issuance." *Id*. at 299 (citing *Illinois v. Gates*, 462 U.S. 213, 240 (1983); *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998); and *State v. Jacumin*, 778 S.W.2d 430, 431 (Tenn. 1989), *overruled on other grounds*); U.S. Const. Amend. IV; Tenn. Const. Art. I, § 7. "Probable cause is more than a mere suspicion but less than absolute certainty." *Tuttle*, 515 S.W.3d at 299. "[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." *State v. Bishop*, 431 S.W.3d 22, 41 (Tenn. 2014). A determination of probable cause is "extremely fact-dependent." *Tuttle,* 515 S.W.3d at 300 (quoting *State v. Bell*, 429 S.W.3d at 524, 534 (Tenn. 2014)) (internal quotation marks omitted). Upon review, this court gives "'great deference' to a magistrate's determination that probable cause exists." *Id*. (quoting *Jacumin*, 778 S.W.2d at 431-432, *overruled on other grounds*).

In determining probable cause for issuance of a search warrant, our supreme court explained that a magistrate must "exercise[] independent judgment," and the affidavit "must contain more than mere conclusory allegations by the affiant" but must have facts upon which the magistrate may make its commonsense probable cause determination *Id*. (citing *Henning*, 975 S.W.2d at 294; *State v. Smotherman*, 201 S.W.3d, 657, 662 (Tenn. 2006)). The magistrate must be able to draw a "reasonable conclusion" from these facts "that the evidence is in the place to be searched." *Id*. (citing *State v. Smith*, 868, S.W.2d 561, 572 (Tenn. 1993). "In other words, the affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Id*. (citing

*State v. Saine*, 297 S.W. 3d 199, 206 (Tenn. 2009)).  The facts in the affidavit which can establish this nexus include

> the type of crime, the nature of the items, . . . the normal inferences where a criminal would hide the evidence[,] . . . whether the criminal activity under investigation was an isolated incident or a protracted pattern of conduct[,] . . . and the perpetrator's opportunity to dispose of incriminating evidence.

*Id*. at 300-301 (internal citations omitted).

However, an issuing magistrate cannot base a determination of probable cause "on the bare conclusions of others."  *Gates*, 462 U.S. at 239.  For example, "[a] sworn statement of an affiant that 'he has cause to suspect and does believe that' liquor illegally brought into the United States is located on certain premises" is insufficient to support probable cause.  *Id*.  "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause[.]"  *Id*.  "[O]nly the information contained within the four corners of the affidavit may be considered" in determining whether probable cause supported the issuance of the search warrant.  *State v. Keith*, 978 S.W.2d 861, 870 (Tenn. 1998) (citations omitted).

In its written order denying Defendant's motion for a new trial, the trial court applied the *Tuttle* "totality of the circumstances" test.  The trial court stated:

> In evaluating the total circumstances, this [c]ourt is of the belief that [] Defendant's possession of the cell phone at the time of his arrest along with communications from [] Defendant regarding the homicide reasonably creates a nexus between [] Defendant's cell phone and the homicide. This Court finds that those statements contained in the search warrant affidavit address the "commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Thus, this Court finds that the search warrant affidavit provided sufficient probable cause for the issuance of a search warrant.

We agree.

Here, the affidavit contains more than the bare conclusions of others.  Affiant states that the affidavit "is based upon information received from other law enforcement officers . . . which the [a]ffiant believes to be true."  In describing that information, the affiant explains when and where a homicide occurred.  The next sentence states, "This cell phone was recovered from the suspect [Defendant] when he was arrested."  A reasonable, commonsense understanding of this sentence in context is that Defendant was

- 20 -

suspected of and arrested for the homicide as detailed in the previous sentence. Because the affiant also explained that the cell phone had communications regarding the homicide, and Defendant had his cell phone at the time of the homicide, the facts as presented in the affidavit create a sufficient nexus between Defendant's cell phone and Mr. Hatcher's homicide. Thus, "those statements contained in the search warrant affidavit address the 'commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.'" Therefore, the trial court properly denied Defendant's motion to suppress. Defendant is not entitled to relief.

### *Jury instruction on self-defense*

Defendant contends that the trial court erred in denying his request to instruct the jury regarding the death of an innocent bystander because Defendant shot towards Mr. Hatcher's location in self-defense. Defendant acknowledges that his requested instruction is not in the Tennessee Pattern Jury Instructions. He asserts that "the failure to so instruct the jury could have easily led the jury to believe that self[-]defense was not a defense to Defendant's actions herein since his testimony was that he must have shot the deceased when he was firing his weapon back at another person who was shooting at him." Defendant contends that his requested instruction was sufficiently raised by the evidence because Defendant testified that Mr. Hatcher was not pointing a weapon at Defendant and Ms. Bowen.

"[T]he trial court has a duty to provide a 'complete charge of the law applicable to the facts of the case.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). However, jury instructions must be reviewed in their entirety, and phrases may not be examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2008) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)) (internal quotation marks omitted).

Tennessee Code Annotated section 39-11-611 provides:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

- 21 -

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

In regards to injury to an innocent bystander through the use of self-defense, Tennessee Code Annotated section 39-11-604 (2015) states:

Even though a person is justified under this part in threatening or using force or deadly force against another, the justification afforded by this part is unavailable in a prosecution for harm to an innocent third person who is recklessly injured or recklessly killed by the use of such force.

"The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001), *overruled on other grounds by State v. White*, 362 S.W.3d 559 (Tenn. 2012). "When the general charge fully and fairly sets forth the applicable law, a special instruction is unnecessary." *State v. Fayne*, 451 S.W.3d 362, 373 (Tenn. 2014). Thus, "the refusal to provide special instructions will be deemed error only if the charged instruction 'fails to fairly submit the legal issues or if it misleads the jury as to the applicable law.'" *Id*. (quoting *State v. Vann,* 976 S.W.2d 93, 101 (Tenn. 1998)).

Here, Defendant claims he accidentally killed Mr. Hatcher when Defendant justifiably used self-defense against Mr. Goodner. In denying a special jury instruction, the trial court stated that defense counsel could argue self-defense during his closing arguments but that the facts did not warrant a special instruction. The trial court provided the pattern jury instruction on self-defense as it stood in Tennessee law, and defense counsel argued self-defense in his closing arguments. Tennessee law does not provide the affirmative defense of self-defense when a defendant's conduct is "reckless" and results in harm to an innocent third person. *See* Tenn. Code Ann. § 39-11-604 (2015). Defendant's requested instruction would remove culpability if his action was "unintentional." However, "unintentional" conduct that is knowing or reckless is not protected by Tennessee law. *See id*. Thus, "denial of a special or additional instruction" was not error because "the trial court's jury charge fully and fairly state[d] applicable law." *Cozart,* 54 S.W.3d at 245. Defendant is not entitled to relief on this issue.

## Conclusion

After reviewing the facts and applicable case law, we affirm the trial court's judgments.

_____
ROBERT L. HOLLOWAY, JR., JUDGE